[DO NOT PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-11266

_____

MIDAMERICA C2L INCORPORATED,
a Nevada corporation,

Plaintiff-
Counter Defendant-
Appellant,

SECURE ENERGY, INC.,
a Nevada Corporation,

Plaintiff-Appellant,

*versus*

SIEMENS ENERGY INC.,
a Delaware corporation,

Defendant-

Counter Claimant-

Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

D.C. Docket No. 6:17-cv-00171-PGB-LRH

_____

Before NEWSOM, BRANCH, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

We GRANT IN PART Secure Energy, Inc.'s petition for panel rehearing, vacate our prior opinion in this appeal, and substitute in its place the following opinion.

This case is about a business relationship gone bad. In 2006, Secure Energy, Inc.—with the intention of opening a coal gasification plant in Illinois—approached Siemens Energy, Inc., about purchasing some gasifiers and other related equipment. By 2007, the parties had entered into a formal contract, under which Secure would buy the equipment on a payment plan and Siemens would continue to provide updates and repairs to the gasification reactors.

Two problems quickly arose.  First, the price of natural gas fell in 2009.  As a result, Secure had to change its business plan multiple times and could not keep up with its payments to Siemens. Second, Siemens's gasification equipment began having problems, as discovered by one of Siemens's other clients in 2010.  By 2012, Siemens began implementing several substantial modifications to its gasifiers in order to get them working properly, but, because Secure had never gotten its plant up and running, Siemens left Secure out of the loop.  In 2015, Siemens decided to exit the gasification market entirely, but promised to continue supporting its existing projects, including Secure's.

These problems created the perfect storm for litigation.  Secure—never having opened, let alone used, its gasification equipment—was commercially failing.  Secure still owed Siemens millions of dollars for the equipment and had just become aware that the equipment it purchased years earlier had issues.  In 2016, after Siemens decided to leave the gasification market, Secure and its subsidiary MidAmerica C2L Incorporated[1] sued Siemens, bringing various fraud- and contract-based claims.  Siemens—which was still owed some thirteen million dollars under the contract and which had given Secure multiple payment extensions on that amount— filed a counterclaim against Secure for breach of contract.

---

[1] For purposes of this opinion, we refer to MidAmerica as Secure unless otherwise expressly noted.

Years into the litigation, Secure sought leave to amend its complaint, which the district court denied due to its untimeliness. Later, the district court excluded Secure's expert witness, Dr. Herbert Kosstrin, for relying on an unreliable methodology, and granted summary judgment in Siemens's favor on each of Secure's affirmative claims. The case thus proceeded to trial only on Siemens's counterclaim. Prior to trial, the district court excluded evidence Secure sought to introduce in support of its breach-of-contract affirmative defense. The jury returned a full verdict in Siemens's favor on its counterclaim, and Secure timely appealed.

On appeal, we are asked to determine four discrete issues: (1) whether the district court abused its discretion in excluding Secure's expert witness; (2) whether the district court erred in entering summary judgment in Siemens's favor; (3) whether the district court abused its discretion in denying Secure leave to amend its complaint; and (4) whether the district court abused its discretion in excluding certain evidence at trial and afterwards denying Secure's motion for a new trial.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Secure was formed in 2006[2] for the purpose of developing and constructing a facility in Decatur, Illinois, to convert coal into

---

[2] Secure's subsidiary, Secure Energy Decatur, LLC, was formed shortly after this time and was the original entity contracting with Siemens.

synthetic natural gas using a process called coal gasification.[3]  To that end, Secure began shopping around for a Basic Engineering Design Package ("BEDP") and Product Design Package ("PDP") from a coal gasification technology provider, eventually contacting Siemens.  Lars Scott and Jack Kenny, the two founders of Secure, met with Rolf Rüsseler and Harry Morehead of Siemens.  During these meetings, Siemens represented to Secure that Secure was purchasing a proven technology from Siemens, as it started the equipment's design in the mid-1970s and it had over twenty years of experience in coal gasification.  Additionally, Siemens represented that its current 500-megawatt gasifiers—which Secure was interested in—employed a technologically advanced cooling-screen system that accepted a wide range of feedstock and could achieve "up to >99%" carbon conversion rates.  And Siemens had already sold the 500-megawatt gasifiers to one customer in China.

Impressed with these representations, Secure decided to use Siemens for its equipment and technology needs.  On July 24, 2007, Secure and Siemens entered into a "Memorandum of Understanding" memorializing the parties' intention for Secure to purchase

---

[3] Gasification converts carbonaceous, fossil-fuel based material (e.g., coal) into gas (e.g., synthetic natural gas) by feeding pulverized coal (called feedstock) into large pieces of equipment called gasifiers.  *See* Ronald W. Breault, *Gasification Processes Old and New: A Basic Review of the Major Technologies*, 3 *Energies* 216, 218 (2010), https://www.mdpi.com/1996-1073/3/2/216.

from Siemens two 500-megawatt gasifiers, associated equipment, engineering services, and a process license.

On December 21, 2007, Secure and Siemens entered into a formal contract (the "2007 Contract") whereby Secure would purchase Siemens's products and services for €27,715,000 plus $1,717,000—in total, approximately $40 million. The 2007 Contract and every subsequent contract at issue here included a merger clause, which stated that neither "party will be bound by any prior obligations, conditions, warranties or representations." Secure promptly paid to Siemens the $40 million called for in the 2007 Contract.

Secure and Siemens also entered into a licensing agreement (the "2007 LSA") whereby Secure licensed Siemens's technology for approximately €11.7 million. Secure was to pay the €11.7 million licensing fee pursuant to an agreed upon fee schedule within the 2007 LSA.

The burners—a core component of Siemens's gasifiers—were delivered to Secure in Decatur, Illinois, in March 2009. Secure alleges that the pins in the cooling screen of the burners were too short and out of specification, although Siemens disputes this characterization. However, Secure only became aware of this alleged defect during the litigation—it never actually opened or put into operation the Siemens gasifiers after it took possession of them.

The price of natural gas dropped precipitously in 2009; as a result, Secure abandoned its original plan of converting coal to natural gas and began planning to build a coal-to-gasoline gasification plant instead. But because the plot of land Secure had acquired in Decatur could not accommodate this change, Secure decided to move its plant to West Paducah, Kentucky.

Secure's new plans in Kentucky required no changes to the Siemens gasification equipment, and the parties continued their business relationship. On March 31, 2010, Secure and Siemens entered into a Completion Agreement (the "2010 Completion Agreement"), which terminated the parties' previous agreements in the 2007 Contract and 2007 LSA, as well as a new License Agreement (the "2010 LSA"). The 2010 Completion Agreement also stipulated that Siemens had met its performance goals under the 2007 Contract and 2007 LSA and released both parties from *any claim* related to those contracts. In addition, the 2010 LSA included a warranty extension on the gasifiers (which would have otherwise expired in 2011) upon Secure's payment of a €1 million fee, but Secure never paid the fee. The 2010 LSA also set forth terms for paying the licensing fee under the agreement, requiring: (1) Secure to pay Siemens €300,000 at the "Contract Date"; (2) €700,000 within five business days of the date of "Closing of New Equity" or July 31, 2010, whichever was later; (3) €10.2 million upon "Financial Close," but no later than August 30, 2011 (unless otherwise agreed to by the parties); and (4) €1.2 million when "Acceptance" occurred, but no later than December 31, 2014.

At around the same time Siemens was working with Secure, Siemens sold five 500-megawatt burners to a client which installed the burners at its coal to polypropylene plant in China ("NCPP"). These burners were first used in October 2010. Immediately, there were problems. The burners that Siemens had used were having trouble converting the Chinese coal into synthetic gas. The pilot burner was also "unreliable" and had to be removed twenty-five times on two of the gasifiers at NCPP in the first two months. The cooling screens also had issues, with the flame from the burner hitting them at an awkward angle.

Siemens explains away these problems by referring to the fact that the Chinese client used below-grade coal in the gasifiers at NCPP and loaded the incorrect fuel source into the burners. And Siemens admits that some of the parts of the gasifiers required repair but maintains that none of the gasifiers were defective. In any event, it is beyond dispute that, from 2010 to 2012, NCPP experienced numerous problems and the Chinese client went forward and made "optimizations and modifications" at NCPP. At one point, the Chinese client sought payment from Siemens for the issues it corrected related to NCPP, and by 2014, the Chinese client had replaced its Siemens burners with burners from a Chinese engineering firm.

Internal Siemens documents from this time period identified the problems. In October 2012, Rüsseler sent an internal Siemens email in which he explained that the "message" to Secure should be to "scrap the equipment, we'll start over again." On November

13, 2012, Siemens circulated an internal memo discussing the needed improvements to the burners, which estimated that the improvements would take 8,520 engineering hours. At this point, Secure had changed its business plan again, this time planning a coal-to-methanol plant at its Kentucky location.

On July 18, 2012, Secure and Siemens entered into a new Completion Agreement ("2012 Contract") and License Agreement ("2012 LSA") (collectively, "2012 Contracts"). The 2012 LSA included a merger clause that terminated all prior agreements. Pursuant to the 2012 LSA, Secure was required to pay Siemens a €12.48 million licensing fee. The 2012 LSA recognized that Secure had already paid €300,000 in 2010, meaning that Secure still owed Siemens €12.18 million under the 2012 LSA. Secure was required to pay the remaining €12.18 million as follows: (1) €10.932 million upon "Financial Close"—defined as the moment "construction financing for the [p]roject ha[d] been arranged," i.e., once Secure had secured financing—but no later than February 28, 2013; and (2) €1.248 million when "Acceptance" occurred—defined by the parties as once specified reliability and performance tests were successfully completed and demonstrated— but no later than December 31, 2015. The 2012 LSA also provided that, in the event Secure fails to make payment when due, and after the 15-business-day cure period, Siemens would have the right to terminate the agreement and Secure would owe Siemens ninety-two percent of the licensing fee if Financial Close had not yet occurred. The 2012 Contracts

substituted MidAmerica, Secure's subsidiary, for Secure as the contracting party.

Not long thereafter, Secure sought to obtain a construction and financing contract for its plant from a company called SK Engineering & Construction.  Siemens agreed to meet with SK and Secure to help Secure acquire that agreement.  During the meeting, Siemens communicated with SK that Siemens would be implementing the improvements it learned at NCPP so long as Secure agreed to pay for them.  Siemens estimated that it would take around 8,500 engineering hours to complete.  In December 2012, however, Siemens suggested internally that incorporating these changes would "tie up resources at a time when [Siemens] need[ed] them more urgently elsewhere" and that, when offering these changes to Secure, Siemens should make "the price and schedule for this change order . . . so unattractive that [Secure] cannot draw th[e] option."

In early 2013, Siemens was in the process of pitching to a new client—the Texas Clean Energy Project ("TCEP").  Because it used a Chinese contractor, TCEP was aware of the problems the Siemens's burners had at NCPP and asked for reassurance that there were solutions to the problems that occurred with the equipment there.  Siemens responded that there were, detailing twenty-eight changes to the design—the design that Secure still had—that would be implemented before the TCEP project got underway.

Secure did not make the license fee payment that came due on February 28, 2013.  At the time, the Siemens gasifiers Secure

purchased had not been opened. And by now, Secure's business was crumbling, with internal documents indicating "substantial doubt about [Secure's] ability to continue as a going concern." Indeed, as of December 2012, Secure admitted that, "[i]n order to continue the coal gasification project, [it must] obtain grants, debt financing or additional equity investment."

In May 2014, Secure emailed Siemens asking when Secure could expect an updated BEDP and asking about the viability of its equipment. Internally, Siemens stated that "very little to nothing can be re-used [sic] and we would have to start from scratch."

By March 2015, Secure stopped making payroll payments to its employees. In July 2015, Secure advised Siemens that there might be "new life for [its] project," as SK had introduced Secure to a group in Houston that were interested in partnering with it on the Kentucky plant. But Secure was never able to obtain the necessary financing for a coal-to-fertilizer plant at the Kentucky site that it hoped would give it that new life. Secure then missed the December 2015 licensing fee payment due to Siemens under the 2012 LSA. By the end of 2015, Secure had not paid any of the licensing fees under the 2012 Contracts, except for the down payment, and it had suspended its business operations.

At the same time, the market constraints that were squeezing Secure had the same effect on Siemens. By mid-2015, Siemens decided to exit the gasification market. On a February 2, 2016, call between Secure and Siemens, Siemens told them of its decision. Secure interpreted the call as an anticipatory repudiation of the

contract—i.e., Secure believed that Siemens was communicating it would not honor the contract.

On February 11, 2016, Secure demanded recission of the 2007 Contract and the return of all monies paid by Secure to Siemens pursuant to that contract. On February 17, 2016, Siemens informed Secure that Siemens would not violate any contractual obligation even though Siemens was closing its coal gasification business.

In March 2016, Siemens proposed extending the license fee payment deadline and the deadline for completing "performance tests." Secure rejected the offer, so Siemens revoked it and demanded payment of the approximately €11.5 million termination fee owed pursuant to the 2012 LSA.

Secure filed suit against Siemens in July 2016, in Illinois state court. Siemens removed the case to federal court, and the case was transferred to the Middle District of Florida. Secure amended its complaint on April 21, 2017. Secure brought six counts: (1) breach of contract; (2) breach of warranty of fitness; (3) fraudulent misrepresentation by Siemens as to support of the project; (4) fraudulent misrepresentation for failure to disclose defects[4]; (5) recission for fraud, and (6) recission for lack of consideration. All in all, Secure sought approximately $86 million in damages—$40 million for the

---

[4] The fraudulent misrepresentation claim for Siemens's alleged failure to disclose design defects was voluntarily dismissed.

loss of value of the equipment and technology it purchased and $46 million for its expenses designing and engineering its plants—and claimed that Siemens anticipatorily repudiated by exiting the gasification market. Siemens answered and asserted a counterclaim for breach of contract, seeking payment of the termination fee owed under the 2012 LSA plus interest. Secure filed a reply to Siemens's counterclaim which asserted various affirmative defenses, including that Siemens "materially breached the terms and conditions" of the 2012 LSA.

Secure voluntarily dismissed its fraudulent misrepresentation claim for support of project. In an order on Siemens's motion for partial dismissal, the district court determined that Secure's rescission for lack of consideration claim was limited to misrepresentations and omissions following March 31, 2010 (the date the parties entered into the 2010 Contract) because the 2010 Contract waived and released all previous claims.

The litigation moved into discovery. Over a year and a half after the deadline to amend pleadings had passed—and just two weeks before the close of fact discovery—Secure asked the district court for leave to amend its complaint so that it could plead new facts and alternative legal theories of recovery. Secure based its motion exclusively on Federal Rule of Civil Procedure 15, concerning leave to amend, but did not address Federal Rule of Civil Procedure 16, which concerns modifications to scheduling orders. The magistrate judge denied the motion. The magistrate judge explained that the motion was brought under the wrong rule, noting

that Secure failed to address the requirements of Rule 16(b)(4), and concluded that Secure had not demonstrated good cause to support belated amendment of the complaint. On February 5, 2019, Secure moved to continue the trial date in order to file an amended complaint. That motion was also denied for failure to provide good cause. After summary judgment was entered in Siemens's favor on Secure's affirmative claims, Secure renewed its motion to continue the trial and amend its complaint. And again, its motion was denied.

Because Secure's claims were premised in large part on defects in the BEDP and the gasification burners, it retained an expert, Dr. Herbert Kosstrin, to testify as to their defective nature. Dr. Kosstrin was prepared to testify that (1) Siemens's BEDP and gasification equipment were defective; and (2) their defective nature prevented Secure from obtaining financing to complete their plants; and (3) the gasification equipment was worthless except for scrap value. Siemens moved to exclude Dr. Kosstrin under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), arguing that he did not inspect the equipment purchased by Secure, that he utilized an unreliable methodology, and that his testimony would be unhelpful to the jury. The district court granted the motion and excluded Dr. Kosstrin's expert opinion and testimony. In its order, the district court explained that Dr. Kosstrin's opinion was not based on any reliable methodology, e.g., by testing or conducting computer modeling on the equipment; was gleaned exclusively from internal Siemens documents that the jury could view

itself; did not adequately compare the Secure project to the NCPP project, including because his comparison lacked sufficient analysis and he failed to consider the data regarding the coal used at NCPP; and that his conclusions consisted entirely of his own *ipse dixit.*

The district court also excluded Dr. Kosstrin's opinion regarding the value of the equipment because it found he lacked the requisite qualification to testify as an expert on the value of the equipment and he never conducted an appraisal analysis. Following the exclusion of Dr. Kosstrin, the district court took up the parties' cross motions for summary judgment. The district court denied Secure's motion for summary judgment. The district court granted Siemens's motion for summary judgment in part and dismissed all of Secure's affirmative claims against Siemens. The district court held that four of the claims—breach of implied warranty, fraudulent misrepresentation, recission-fraud, and recission-lack of consideration—were premised on the "same 'material design defects' allegations" and that, because Secure had no expert to testify that the gasification equipment was in fact defective, Secure had no evidence to support these claims.

With respect to Secure's breach of contract claim, the district court held that Secure's breach of contract claim was limited to the repudiation theory it alleged in its Complaint and that Secure failed to prove that its damages were the direct and proximate result of Siemens's alleged conduct to support that theory of liability. The district court denied Siemens's motion for summary judgment on Siemens's counterclaim.

Following the summary judgment orders, the case proceeded to trial only on Siemens's counterclaim for breach of contract, premised on the 2012 LSA.  Prior to trial, Siemens filed a motion in limine seeking to exclude: (1) nonpleaded, dismissed, released, or rejected claims including alleged defects, misrepresentations, fraudulent concealments, and any theory that Secure is excused from nonperformance of the 2012 LSA except for the anticipatory repudiation theory; (2) evidence concerning alleged problems at the NCPP plant; and (3) evidence related to the alleged failure to inform or provide improvements under the 2012 LSA; as well as other evidence that Siemens argued was irrelevant to its counterclaim and Secure's defenses.  The district court granted Siemens's motion, thereby limiting Secure's affirmative defense that Siemens breached the 2012 LSA to Secure's anticipatory repudiation theory.

At the conclusion of trial, Secure made a motion for judgment as a matter of law—arguing that the evidence demonstrated that Siemens repudiated the 2012 LSA and that Secure did not breach the agreement.  The district court denied the motion.

The jury returned its verdict on March 4, 2020, in which it rejected Secure's anticipatory repudiation defense and awarded Siemens $13,200,395.50 in damages.  After the jury verdict, Secure renewed its motion for judgment as a matter of law and, in the alternative moved for a new trial because, among other reasons, the district court excluded evidence that Siemens failed to perform under the 2012 LSA.  The district court denied both motions and held,

with respect to the exclusion of evidence related to Siemens' alleged breach, that Secure's new defense of an alleged breach unrelated to anticipatory repudiation was untimely and failed to articulate a material breach.  Secure filed this timely appeal.

## II.    STANDARDS OF REVIEW

We review for abuse of discretion a district court's decisions regarding the admissibility of expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142–43 (1997); *accord United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) ("This Court has uniformly applied the deferential abuse-of-discretion review that *Joiner* mandates.").  We will find an abuse of discretion only if the district court's ruling was "manifestly erroneous." *Joiner*, 522 U.S. at 142 (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658 (1878)); *Frazier*, 387 F.3d at 1258.  A district court of course abuses its discretion when it applies the wrong legal standard. *Frazier*, 387 F.3d at 1259.

We review an order granting summary judgment *de novo*, applying the same legal standards as the district court. *Amy v. Carnival Corp.*, 961 F.3d 1303, 1308 (11th Cir. 2020).  We view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in his favor. *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).  "Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir. 2009) (quoting *Haves*, 52 F.3d at 921); Fed. R. Civ. P. 56(a)).

We review a district court's denial of a motion for a new trial for abuse of discretion. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1255 (11th Cir. 2016). "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312–13 (11th Cir. 2013) (quoting *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1200 n. 16 (11th Cir.2009)). Relatedly, we review the district court's grant of a motion in limine for abuse of discretion. *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1161 (11th Cir. 2005) (per curiam). Under the abuse-of-discretion standard, we may reverse a decision of the district court only if the court applies an incorrect legal standard, follows improper procedures in making its determination, or makes findings of fact that are clearly erroneous. *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1311 (11th Cir. 2019). And, a "district court has wide discretion in determining the relevance of evidence produced at trial." *Cabello*, 402 F.3d at 1161. Even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, . . . undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## III.    ANALYSIS

On appeal, Secure contends that the district court erred in: (1) excluding Dr. Kosstrin's testimony; (2) granting summary judgment; (3) denying its requests to file an amended complaint; and

(4) denying Secure's motion for a new trial on the grounds that Secure was barred from presenting evidence that Siemens breached the 2012 LSA. We address each argument in turn.

## A. Did the district court err in excluding Dr. Kosstrin?

Our analysis regarding the admissibility of expert testimony begins with Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

As explained by the Supreme Court, the purpose of the expert admissibility rules is to enlist the federal courts as "gatekeepers" tasked with screening out "speculative" and "unreliable expert testimony." *Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1335 (11th Cir. 2010) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). In this Circuit, we have distilled the expert admissibility inquiry into the following three factors:

(1) the expert is qualified to testify competently regarding the matters he intends to address;

(2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (footnote omitted). We have also noted that "[w]hile there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)).

Here, the district court rested its exclusion of Dr. Kosstrin's opinions on the qualifications and reliability prongs. Regarding an expert's qualifications, we have explained that:

we observe that experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear: expert status may be based on "knowledge, skill, *experience,* training, or education." (emphasis added). The Committee Note to the 2000 Amendments of Rule

702 also explains that "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 advisory committee's note (2000 amends.).

Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express. As we observed in *Quiet Technology,* "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. . . . [O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." 326 F.3d at 1341–42. Quite simply, under Rule 702, the *reliability* criterion remains a discrete, independent, and important requirement for admissibility.

*Id.* at 1260–61 (alterations in original).

As to the reliability prong, we have noted that "[r]ulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002). The Supreme Court has identified a number of factors for courts to consider in conducting that analysis, including: (1) whether the theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer

review and publication; (3) the known or potential rate of error; and (4) whether the theory has attained general acceptance in the relevant scientific community. *See Daubert*, 509 U.S. at 593–94. Importantly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert," and the "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

In this case, Secure retained Dr. Kosstrin to testify as to three issues: (1) "the defects in the Siemens Equipment and Technology—as evidenced by Siemens's first test of its designs at NCPP— prevented Appellants' gasifiers from meeting their contractually-guaranteed performance"; (2) "the defects prevented [Secure] from obtaining financing for their project"; and (3) "in light of the defects, the Equipment and Technology have only scrap value."

Dr. Kosstrin, who holds a Ph.D. in Mechanical and Aerospace Engineering from Cornell University, has forty years of experience in the alternative energy field, including alternative fuels. In preparing his testimony and reaching his conclusions, he reviewed a number of documents that Siemens produced in discovery, including documents related to the design of the gasifiers. In his report, Dr. Kosstrin makes clear that this is *all* he reviewed, stating "the basis for this opinion is a review of exhibits and information concerning the NCPP plant's operations up to the signing of the 2012 [LSA]."

Dr. Kosstrin's methodology was as follows. Because Siemens had shipped nearly identical burners to their Chinese client at NCPP, Dr. Kosstrin hypothesized that, if those burners were experiencing problems, then the Secure burners would as well. His report thus detailed the design of the NCPP burners, explained the problems experienced at NCPP, and stated that Secure would have experienced the same problems with its Siemens burners, if Secure had ever opened and used them.

The district court excluded Dr. Kosstrin's expert testimony, and in its order, identified a number of problems with Dr. Kosstrin's testimony: (1) "Dr. Kosstrin did not perform any testing on the Secure equipment, because it was never installed"; (2) "Dr. Kosstrin did not conduct any computer modeling or simulations of the Secure equipment's performance . . . , and he did not communicate with anyone involved in the NCPP plant to determine why they made changes to the equipment"; (3) Dr. Kosstrin's expert report contained "no opinions on how the coal at the NCPP plant compared to the design coal for the Secure project"—i.e., while acknowledging that the NCPP plant used a grade of coal that was outside the range specified by Siemens in the contract with NCPP, Dr. Kosstrin did not account for how this might affect the performance of the burners; (4) Dr. Kosstrin did not conduct an individual cost analysis for the hypothetical corrective measures and could not say whether the modifications were inexpensive; (5) Dr. Kosstrin knew that the Chinese operators ran the gasifier at below minimum load but "did not perform an analysis to determine

whether NCPP was complying with the minimum load case, or the impact on operations"; (6) Dr. Kosstrin "did not consider alternative designs that Siemens should have employed"; and (7) he failed "to compare the Secure BEDP *to any other BEDP for coal gasification.*" (emphasis added).  In short, the district court excluded Dr. Kosstrin's testimony as to design defects because he did not run any analysis on the equipment at issue and compared the equipment to the NCPP equipment in a manner that failed to account for two variables that Siemens listed *in the contract* as causing problems with the burners.

As to the third issue on which Dr. Kosstrin sought to testify—that the equipment had only "scrap value"—the district court found that Dr. Kosstrin lacked the requisite qualifications to testify on the subject, noting that Kosstrin is "not a certified appraiser" and "has never performed an appraisal analysis."

Under our deferential standard of review, we cannot conclude that the district court abused its discretion in excluding Dr. Kosstrin's testimony.  Our caselaw makes clear that, in order for a methodology to be reliable, the expert must be able to adequately explain how the data he relied on led him to his conclusions.  In a case such as this one—where the expert notes that many factors could have contributed to the defect at issue—this means the expert must be able to explain his consideration of the other alternative causes. *See, e.g.*, *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1253 (11th Cir. 2010) (per curiam) (noting that an expert "need not rule out all possible alternative causes," but "must at

least consider other factors that could have been the sole cause of the plaintiff's injury"). Caselaw on this point is legion.

*Frazier* is one such case. There, the expert was prepared to testify as to the transfer of hairs and bodily fluids during a sexual assault. 387 F.3d at 1252. But the expert "offered precious little in the way of a reliable foundation or basis for his opinion." *Id.* at 1265. While the expert was eminently qualified to testify and formed his opinion based on his experience in the field, we affirmed the exclusion of his testimony because he never explained *how* he was able to reach his opinion. *Id.* Because he did not so explain, we said that "it would be very difficult indeed for the district court (or for that matter the jury) to make even an informed assessment, let alone to verify" that the opinion was reliable. *Id.* We reemphasized that "it remained the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached." *Id.*

*Hughes v. Kia Motors Corp.*, 766 F.3d 1317 (11th Cir. 2014), is another such example. In *Hughes*, the expert sought to testify that the plaintiff would not have sustained a fatal injury had her automobile been equipped with a "shut-off switch," claiming to have reached this conclusion "based on the scientific method" but "without further explaining how he tested his hypothesis to support his conclusions." *Id.* at 1329–30. Relying on *Frazier*, we concluded that the district court did not abuse its discretion in excluding the expert's testimony. *Id.* at 1329. And we noted that the expert was unable to account for other factors that contributed to the

death, such as the impact of the semi-truck, admitting that he lacked sufficient information to rule out *any* other causes. *Id.* at 1330.

Both cases hold obvious relevance to the issue presented. In both *Frazier* and *Hughes*, we affirmed the exclusion of expert evidence because the proponent of that testimony was unable to link the expert's methodology—or lack thereof—to his conclusions. The same is true here. The district court concluded that Dr. Kosstrin was unable to adequately explain *how* he reached his conclusions other than by pointing to the NCPP plant—which, as already mentioned, had a slew of additional variables not present in the Secure situation. As we have previously stated, "[s]omething [does not] become 'scientific knowledge' just because [it is] uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were derived by the scientific method be deemed conclusive." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (quoting *Daubert*, 43 F.3d at 1315–16). Indeed, the "trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citing *Daubert*, 43 F.3d at 1319). Here, Dr. Kosstrin provided nothing but his word and own *ipse dixit*. He pointed to the NCPP plant and said, without any verifiable methodology or consideration of the factors unique to that plant, that Secure would have experienced the same problems. The district court thus did not abuse its discretion by excluding his testimony.

The same is also true of the district court's decision to exclude Dr. Kosstrin's testimony related to the value of the burners. Even setting aside the district court's ruling as to qualifications on this issue, Dr. Kosstrin's valuation of the gasifiers was based exclusively on his conclusion that the gasifiers were defective. Because that opinion was unreliable, his opinion as to value is also necessarily so.

## B. Did the district court err in granting summary judgment?

As noted above, the district court entered summary judgment in Siemens's favor on each of Secure's claims against it. Before analyzing the claims on a count-by-count basis, however, two preliminary issues bear mentioning.

First, the parties have both waived any arguments regarding which state's law should apply. In the district court, the parties disputed whether the law of Kentucky, Missouri, or Florida should apply to the non-contract claims.[5] In the district court's order granting summary judgment, the court applied Florida law to each of the non-contract claims. And on appeal, neither party argues that the district court erred in doing so.

Choice of law is not jurisdictional. *See Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 778 (1984) ("The question of the applicability of New Hampshire's statute of limitations to claims for out-of-state damages presents itself in the course of litigation only after

---

[5] There is no dispute that New York law applies to the contract claims.

jurisdiction over respondent is established, and we do not think that such choice of law concerns should complicate or distort the jurisdictional inquiry."). And, as such, it is waivable if the parties abandon the issue on appeal. *See Mesa Air Grp., Inc. v. Delta Air Lines, Inc.,* 573 F.3d 1124, 1128 (11th Cir. 2009) (finding that where a party had failed to present a choice-of-law issue to the trial court, the issue was waived on appeal). Accordingly, we apply Florida law to all of the non-contract claims.

Second, the district court granted summary judgment against Secure on four of its claims—breach of implied warranty of fitness, fraudulent misrepresentation, recission-fraud, and recission-lack of consideration—based solely on the theory that, because these claims were premised on a design defect, Secure needed an expert witness to testify as to the defect. And because Dr. Kosstrin had been excluded—properly, as we have already concluded—Secure had no such expert testimony. The district court, however, did not identify a single case holding that a plaintiff is required to present expert testimony to bring a claim for fraud or breach of implied warranty. Instead, the district court borrowed language from cases discussing the causation element in *negligence* and *strict liability* actions and applied it here. For example, the district court cited *Small v. Amgen, Inc.*, 723 F. App'x 722, 726 (11th Cir. 2018), an unpublished products liability case from this Court, for the proposition that "in complex cases where a jury is asked to assess complex medical or scientific issues outside the scope of a layperson's knowledge, an expert's testimony is required." In

doing so, the district court ignored the first clause of the sentence stating "[r]egarding discovery and proof of causation." Indeed, each of the cases cited by the district court (and Siemens) were focused *only* on the element of causation in tort suits.

In *Lucas v. Firestone Tire & Rubber Co.*, 458 F. 2d 495, 497 (5th Cir. 1972),[6] we were confronted head-on with the task of "mak[ing] the initial determination as to the state of Florida law governing breach of implied warranty cases as that law applies to the question presented, i.e., whether plaintiff must introduce the testimony of an expert that the [product] was defective." We answered that question in the negative: "There is no burden on plaintiff to prove a specific defect by an expert witness as distinguished from other proof. The fact of a malfunction and also of a defect may be proven by direct or circumstantial evidence." *Id.* We are aware of no case post-dating *Lucas* that stands for the contrary position, and neither party has directed our attention to one. As such, we apply the rule of *Lucas* and hold that Florida law does not require plaintiffs in contract cases to prove the defective nature of the product at issue with expert testimony.

Although the district court's reason for granting summary judgment was incorrect, we can, as a general principle, affirm on any basis supported by the record. *See Lucas v. W.W. Grainger,*

---

[6] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit prior to October 1, 1981).

*Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001).  But, following the issuance of our prior opinion in this case, this Court issued its *en banc* decision in *United States v. Campbell*, 26 F.4th 860 (11th Cir. 2022) (en banc).  In *Campbell*, this Court held that "the mere failure to raise an issue in an initial brief on direct appeal should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* in extraordinary circumstances after finding that one of our [*Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324 (11th Cir. 2004),] forfeiture exceptions applies."  *Id.* at 873.  The *Access Now* exceptions are:

> (1) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice; (2) the party lacked an opportunity to raise the issue at the district court level; (3) the interest of substantial justice is at stake; (4) the proper resolution is beyond any doubt; or (5) the issue presents significant questions of general impact or of great public concern.

*Id.* (citing *Access Now*, 385 F.3d at 1332).

Under *Campbell*, however, our analysis does not stop at whether one of the *Access Now* exceptions applies.  If we find that one of the forfeiture exceptions applies, we still must decide "whether the issue is extraordinary enough for us to exercise our discretion and excuse the forfeiture."[7]  *Id.* at 875.  And, "[i]n most

---

[7] Siemens contends that *Campbell* did not "rob" us of the principle that we may affirm on any ground presented by the record, even those not considered

20-11266                 Opinion of the Court                          31

cases, "an issue abandoned on appeal should still be dismissed without reaching the merits." *Id.*

As Secure notes, Siemens failed to brief the alternative arguments on appeal it raised below in support of its motion for summary judgment on Counts 2, 4, 5, and 6. Therefore, we must first consider whether any of the forfeiture exceptions apply. Turning to the forfeiture exceptions, only the fourth exception—whether the proper resolution of the issue is beyond any doubt—arguably applies here. But, even assuming the fourth exception applies, we consider whether Siemens has not demonstrated "an extraordinary circumstance such that we should exercise our discretion to excuse [its] forfeiture." *See id.* at 877. In *Campbell*, we found that there were extraordinary circumstances present where: (1) this Court had "an extraordinary interest in protecting the public and encouraging good police work by ensuring that evidence obtained in good faith reliance on binding appellate precedent is not excluded"; (2) the district court had correctly denied the motion to suppress, and this Court was "loathe" to reverse where the issue was inadequate defense of the district court's correct judgment; (3) the case was "a good-faith exception case in which there are no material factual disputes," i.e., a "pure question of law"; and (4) the appellant's

---

or relied upon by the district court, as elucidated by cases such as *Lucas*, 257 F.3d at 1256. While we generally agree, in cases where one of the parties has not raised issues on appeal that they made below in support of affirmance or reversal, we must apply *Campbell*'s two-step analysis in considering whether to exercise our discretion to hear forfeited issues.

arguments to the panel placed the issue before the Court. *See id.* at 877–79.

By contrast, this case presents a commercial dispute between two parties, with the forfeited arguments concerning a motion for summary judgment. None of the public policy considerations present in *Campbell* exist here. Further, the district court did not consider Siemens's alternative arguments in its order granting summary judgment, and Siemens will be able to raise those arguments again to the district court, should it choose to do so. While Siemens contends that not considering its unbriefed, alternative arguments would be a waste of judicial (and the parties') resources "and would 'reward[]'" Secure for "creating word constraints by advancing meritless arguments," it does not cite to any authority suggesting that this constitutes extraordinary circumstances. And we decline to do so under the circumstances of this particular case.

Accordingly, we conclude that, *for purposes of this appeal*, Siemens has forfeited its alternative grounds for affirming the district court's grant of summary judgment as to Secure's claims in Counts 2, 4, 5, and 6. On remand, Siemens can re-assert the alternative arguments it raised below to the district court as a basis for summary judgment on those claims, should it choose to do so.

Having resolved the *Campbell* issue as to Counts 2, 4, 5, and 6, we now turn to whether the district court correctly granted summary judgment on Secure's claim for anticipatory repudiation in Count 1. The parties agree that New York law governs the contract claims in this case, including Secure's anticipatory repudiation

claim.  Under New York law, "[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty."  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

> An anticipatory breach of contract—also known as an anticipatory repudiation—"can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach."

*Princes Point LLC v. Muss Dev. L.L.C.*, 87 N.E.3d 121, 133 (N.Y. 2017) (quoting *Norcon Power Partners v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659 (N.Y. 1998)).  For an anticipatory repudiation to occur, "the expression of intent not to perform by the repudiator must be 'positive and unequivocal.'"  *Id.* (quoting *Tenavision, Inc. v. Neuman*, 379 N.E.2d 1166, 1168 (N.Y. 1978)); *see also Rachmani Corp. v. 9 E. 96th St. Apartment Corp.*, 211 A.D. 2d 262, 267 (N.Y. App. Div. 1995) (requiring a "definite and final communication of the intention to forego performance before the anticipated breach may be the subject of legal action").  "Mere expression of difficulty in tendering the required performance, for example, is not tantamount to a renunciation of the contract."  *Rachmani*, 211 A.D. at 267.

While an anticipatory breach obviates the need for the non-breaching party to tender performance, the nonbreaching party

must nonetheless demonstrate that it was "ready, willing[,] and able to perform its obligations under the contract" at the time its performance would have been due in order to recover damages. *Inter-Power of N.Y. Inc. v. Niagara Mohawk Power Corp.*, 686 N.Y.S.2d 911, 913 (N.Y. App. Div. 1999); *accord Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d. Cir. 1990). This principle is merely an application of the general rule that the complaining party must demonstrate that the breach caused him injury; "[t]o do this he must prove that he intended to and was able to perform when his performance was due." *Scholle v. Cuban-Venezuelan Oil Voting Tr.*, 285 F.2d 318, 320 (2d Cir. 1960).

In addition, causation is an essential element of the claim. *See Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728, 731 (2d Cir. 1992). The plaintiff "must demonstrate that the damages were caused by and are 'directly traceable to the [defendant's] breach.'" *Id.* at 731 (alteration in original) (quoting *Kenford Co. v. County of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986)). Where the ultimate transaction would have failed, and where the plaintiff's claimed damages would have resulted even if no breach occurred, the plaintiff cannot prove that his damages resulted from the defendant's conduct. *See id.* (affirming the district court judgment because the plaintiff sought "to recover for a loss on a transaction separate from the transaction that gave rise to the breach").

Secure claims that Siemens anticipatorily breached by leaving the coal gasification market because, in doing so, Siemens demonstrated that it would not honor its obligations under the

2012 LSA. The district court identified two problems with the anticipatory repudiation claim: (1) that Secure could not prove causation, and (2) that Secure could not prove it was ready, willing, and able to perform. We agree with the district court.

First, Secure is unable to prove causation. The district court determined that there was no evidence of a causal relationship between Siemens's anticipatory repudiation and the damages Secure sought because Secure, at the time of the alleged repudiation, had not obtained the necessary financing for its project. Furthermore, the district court noted that Secure's claimed damages from the "useless equipment and technology" would have resulted regardless of whether Siemens exited the gasification market. Secure responds by pointing to the fact that their proposed EPC financiers were troubled by the performance of the Siemens gasifiers. But there is an obvious problem with Secure's theory: the discussion with the financiers occurred in 2012 while the alleged repudiation occurred more than three years later, in February 2016. Secure has not presented any record evidence tying an inability to secure financing *after* Siemens's alleged breach and, as such, has no evidence of causation. We can affirm on this basis alone.

Second, the "ready, willing, and able" requirement also bars recovery. New York law requires the "plaintiff alleging an anticipatory breach of contract [to] show (1) that the defendant insisted upon terms not contained in the contract; and (2) that the plaintiff was 'ready, willing, and able to perform its own obligations under the contract when performance was due.'" *United States v. Hon*,

17 F.3d 21, 26 (2d Cir. 1994) (quoting *Towers Charter,* 894 F.2d at 523). The district court concluded that Secure was not ready, willing, and able to perform because Secure was in financial ruin and had missed multiple payments on the contract before the alleged repudiation. We agree. For Secure to succeed on its anticipatory repudiation claim under New York law, Secure had to show that, at the time Siemens exited the gasification market (and thus, in Secure's telling, anticipatorily repudiated the contract), Secure was able to perform its own obligations. But because Secure had already missed *multiple* payments under the contract at that time, Secure itself was already in breach, and thus *un*ready and *un*able to perform. And finally, we note that when Siemens decided to exit the gasification market in 2015, it promised to continue supporting its existing projects, including Secure's.

Therefore, the district court did not err in granting summary judgment as to Count 1. Accordingly, we affirm the district court's grant of summary judgment as to Count 1 and reverse its grant of summary judgment as to Counts 2, 4, 5, and 6.

### C. Did the district court err in denying leave to amend?

Next, we address the district court's denials of Secure's motions for leave to amend. As noted above, we "will only reverse a district court's denial of a motion to amend in instances in which the district court has clearly abused its discretion." *Henson v. Columbus Bank & Tr. Co.,* 770 F.2d 1566, 1574 (11th Cir. 1985). Normally, to acquire permission to amend one's pleading, a litigant need only establish the relatively lenient standard of Rule 15(a),

which states that leave shall be granted "when justice so requires." However, when a party moves to amend their complaint after the deadline for doing so set by the district court in its scheduling order, a litigant must also "show good cause why leave to amend the complaint should be granted." *Smith v. Sch. Bd. of Orange Cnty.*, 487 F.3d 1361, 1366 (11th Cir. 2007) (per curiam); *see also* Fed. R. Civ. P. 16(b); *Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1419 (11th Cir.1998) (per curiam) ("If we considered only Rule 15(a) without regard to Rule 16(b), we would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure."). We have recognized that Rule 16's "good cause standard precludes modification [of the scheduling order] unless the schedule cannot be met despite the diligence of the party seeking the extension." *See Sosa,* 133 F.3d at 1418 (quoting Fed. R. Civ. P. 16 advisory committee's note); *see also Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir. 1992) ("If [a] party was not diligent, the [good cause] inquiry should end.").

In this case, Secure filed its first amended complaint on April 21, 2017. Following a scheduling conference, the district court entered a scheduling order on May 18, 2017, which set a deadline to amend pleadings for June 1, 2017. Due to joint motions by the parties, the scheduling order was twice amended, but neither amendment changed the deadlines for amending pleadings.

Secure first moved for leave to amend its complaint on December 28, 2018—already more than a year after the deadline to

amend pleadings had passed.  Secure sought leave to amend its complaint to add new factual allegations and legal theories of recovery, based largely on having finally completed its review of the large amount of documents produced to it by Siemens, as well as the depositions of current and former Siemens employees.  The magistrate judge denied that motion, noting that "the breadth of document production was directly related to the breadth of [Secure's] discovery requests, and Secure could not cry foul over getting what it asked for.  Nor did Secure identify any testimony from the depositions that related to the proposed amendments.  In addition, the magistrate judge noted that discovery had already been ongoing for two years, and Secure provided no explanation as to why it was unable to uncover the information sooner.  Finally, the magistrate judge noted that Secure had relied on the incorrect legal standard—Rule 15 instead of Rule 16.

Just a few days later, Secure moved to extend the trial date, in what it now admits was nothing but a ruse to amend its complaint.  Because this was nothing more than an attempt to circumvent the court's previous order, it was summarily denied for essentially the same reasons.

Eventually, the district court granted Siemens's motion for summary judgment and denied Secure's motion for summary judgment.  After those rulings—and more than two years after the deadline to amend pleadings had passed, and just a few weeks before trial was scheduled to commence—Secure moved for leave to amend its complaint a *third* time.  The district court denied that

request. In its denial, the district court forcefully reminded Secure that its litigation tactics "in this regard run dangerously close to sanctionable actions under [Federal Rule of Civil Procedure] 11."

We had occasion to apply Rule 16 to similar circumstances to these in *Smith v. School Board of Orange County*. There, the plaintiff sought leave to amend his complaint (after the deadline for doing so set by the scheduling order) because, in his view, discovery had "produced new violations of the [l]aw that must be addressed within the counts of the complaint." 487 F.3d at 1367 (alteration in original). The district court denied leave to amend because the defendant's motion for summary judgment had already been pending for a month and because the plaintiff failed to explain why the facts underlying the amendment were undiscoverable previously. *See id.* We affirmed, noting the "extreme untimeliness of [the plaintiff's] motion and his lack of a complete showing of good cause." *Id.*

The district court's rulings here were not an abuse of discretion for the same reasons articulated in *Smith*. To satisfy Rule 16, a litigant must show that it could not meet the scheduling order "despite the diligence of the" litigant. *Sosa*, 133 F.3d at 1418. Here, Secure was seeking leave to replead already-dismissed claims and add new facts and theories of recovery, including a fraudulent inducement claim that Secure says it was able to plead "with greater particularity," more than a year after the deadline to amend pleadings had passed. But, as Secure admitted, the facts that formed the basis of its amendment were available "at the earliest just *prior* to

the amendment deadline." (emphasis added). What Secure actually complains of, then, is not that the facts were *not* ascertainable, but that it took Secure too long to conduct discovery. That is not due diligence. And it is thus not good cause. We affirm the district court's denials of leave to amend.

### D. Did the district court err in denying Siemens's ability to present its affirmative defense?

The final issue for our consideration concerns the district court's order denying Secure's motion for a new trial and the district court's related ruling on Siemens's motion in limine. At issue is the scope of evidence Secure was permitted to present at trial. As noted previously, the only *affirmative* breach-of-contract claim that Secure advanced throughout the trial was an anticipatory repudiation claim. However, *defensively* (i.e., in response to Siemens's breach of contract counterclaim regarding the 2012 LSA), Secure asserted a broader breach-of-contract based affirmative defense. As its eighth affirmative defense, Secure asserted that "[t]o the extent Siemens seeks recovery in contract, Siemens materially breached the terms and conditions of said contract and is entitled to no relief thereon."

In its motion in limine, Siemens sought clarification as to whether Secure would present evidence only of anticipatory repudiation or whether Secure would be permitted to present evidence of other alleged breaches of contract, which Secure had not yet raised in the litigation. Specifically, the other theories that Secure sought to introduce evidence of were: (1) Siemens breached the

contracts by delivering defective gasification equipment; and (2) Siemens breached the contracts by failing to inform Secure of available improvements to the gasification equipment and technology.

The district court granted Siemens's motion in limine and excluded any evidence Secure sought to present regarding the above-listed theories of breach of contract. Thereafter, Secure re-raised this issue in its motion for a new trial. In granting Siemens's motion in limine and denying Secure's motion for a new trial, the district court gave a number of justifications for its decision to exclude this evidence. First, the district court noted that Secure was attempting to advance a trial-by-surprise strategy. This affirmative defense, and the facts related to that defense, were not pled. And Secure's own affirmative claim for breach of contract was premised exclusively on Siemens's alleged anticipatory repudiation. Therefore, to allow Secure to present both a defense based on both anticipatory repudiation and other alleged breaches of contract was, in the eyes of the district court, fundamentally unfair to Siemens. Second, the district court noted that the failure to provide notice of improvements was not a material breach of the contract at issue. Third, and perhaps most importantly, the district court found that the evidence was not relevant, noting that Secure's new theories of breach of contract (very much unlike the anticipatory-repudiation theory) could not have excused its performance under Siemens's counterclaim because that counterclaim was only for the termination fee under the 2012 LSA.

On appeal, Secure asks for reversal based only on the second theory it sought to add as part of its affirmative defense, arguing that the district court erred when it excluded evidence related to Siemens's alleged breach in failing to notify Secure of improvements.

We find no abuse of discretion in the district court's ruling based on the relevant facts at issue here. On July 3, 2012, the parties entered into the 2012 LSA. That contract terminated and released all claims under the previous agreements between the parties and required Secure to make an approximately €12 million license fee payment. Two provisions of that contract are at issue here. First, under § 5.1, the 2012 LSA required Siemens to inform Secure "of any Improvements to the Technology which are developed or acquired and released for commercial application by Siemens," and Secure had an option to contract for those improvements for an additional fee. Second, under § 11.3.1, the 2012 LSA allowed Siemens to terminate the contract if Secure "fails to make any payment when due" provided Siemens provided Secure a fifteen-day cure period. If Siemens exercised that option, the 2012 LSA provided that Secure would owe to Siemens ninety-two percent of the licensing fee (more than €11 million). After Secure missed the deadline on its license fee payment, Siemens, in February 2016, offered Secure an extension on the deadline to pay. After Secure refused that extension, Siemens exercised its option to terminate the contract and, after providing Secure a cure period, invoiced Secure for ninety-two percent of the licensing fee.

The issue is whether Siemens's alleged breach of § 5.1 might somehow excuse Secure's performance under § 11.3.1.  As an initial matter, we agree with the district court that Secure should not be permitted to raise this theory because Secure had not put Siemens on notice of it.  *See Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1350 (11th Cir. 2007) ("In deciding waiver issues under [Fed. R. Civ. P.] Rule 8(c), this Court [examines] whether a plaintiff had notice of the unpled defense or was prejudiced by the lack of notice.").  The Federal Rules of Civil Procedure make clear that a defendant raising an affirmative defense must "affirmatively state" it.  Fed. R. Civ. P. 8(c).  And this requires, at the minimum, putting the plaintiff on notice of the nature of the defense.  *See Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971) ("The purpose of [Fed. R. Civ. P. 8(c)] is to give the opposing party notice.").

In this case, Secure asserted a boilerplate affirmative defense, alleging only that Siemens's breached the contract without any identification of either the legal theory of breach or the contractual provision at issue.  And when Siemens moved for summary judgment on its breach of contract counterclaim regarding the 2012 LSA, Secure responded to that motion without referencing § 5.1 of the contract.  Given that Secure's theory of breach of contract, as shown by its affirmative claim and its response to Siemens's motions, was premised only on anticipatory repudiation, we cannot say that the district court abused its considerable discretion on

evidentiary matters by excluding Secure's evidence relating to different breach-of-contract theories at trial.

Moreover, the district court was also correct that the defense was legally inadequate, and therefore irrelevant. "In diversity actions, we look to state law to inform the determination of whether a certain defense is 'any other matter constituting an avoidance or affirmative defense' under the federal rule." *Proctor*, 494 F.3d at 1350 (quoting *Troxler v. Owens-Illinois, Inc.*, 717 F.2d 530, 532 (11th Cir. 1983)). Here, New York law, which governs the contract claims, allows breach of contract to be raised as an affirmative defense. *See L & L Excavating Corp. v. Abcon Assocs., Inc.*, 594 N.Y.S.2d 818, 820 (N.Y. App. Div. 1993). However, a "party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (applying New York Law). In other words, "a non-breaching party's obligation to perform is excused only when there is a material breach by the other party." *AKTIV Assets LLC v. Centerbridge Partners, L.P.*, No. 653259/2019, 2019 WL 7165927, at *7 (N.Y. Sup. Ct. Dec. 24, 2019) (citing *Smoley v. Carole Hochman Design Grp., Inc.*, 79 A.D.3d 540, 541 (1st Dep't 2010)). And whether a breach is material can be decided as a matter of law. *See id.*; *Cont'l Ins. Co. v. RLI Ins. Co.*, 555 N.Y.S.2d 325, 328 (N.Y. App. Div. 1990); *see also Frank Felix Assocs.*, 111 F.3d at 289. "[I]n determining whether [a] material breach relieves non-breaching party's obligation to perform,

'the extent to which the agreement provides for performance without delay' should be considered." *Frank Felix Assocs.*, 111 F.3d at 289 (quoting Restatement (Second) of Contracts § 242(c)).

The district court ruled that, as a matter of law, the breach asserted by Secure was not material, in part because the 2012 LSA did not impose any deadline on Siemens to provide notice of the improvement and Secure had to pay for any improvements. *Id.* ("In determining if [Siemens's] breach defeated the object of the [2012 LSA], we must consider the special purpose of the contract" and look to "the extent to which the injured party will be deprived of the benefits [it] reasonably expected"(citing Restatement (Second) of Contracts § 241)). Moreover, the record evidence establishes that Siemens *did* provide Secure notice of design improvements on October 31, 2012, during a call between SK, Siemens, and Secure, in which Siemens indicated that it would include the design improvements if Secure paid for the re-engineering. At the time of Secure's breach, then, Secure was already aware of the improvements. Secure, however, missed its licensing fee payments due in February 2013 and December 2015 after Siemens provided notice of the improvements. Indeed, Secure stipulated that it was unable to perform under the terms of the 2012 LSA and therefore could not have paid for the improvements, as the district court held, even if Secure had chosen to obtain them. As such, the notice for those improvements could not have been the reason Secure itself breached the contract.

The district court was thus right to conclude that Siemens's alleged breach—not providing notice of the improvements *sooner*—was not material to the contract. Because the contract did not impose any time limitation on when notice of improvements should be given, and because the record evidence established that Secure had notice of the improvements before Secure failed to tender payment, Siemens's breach was irrelevant to the claim presented.

## IV.    CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment as to Secure's claims in Counts 2, 4, 5, and 6, and remand for the district court for further proceedings. On remand, Siemens can re-assert the alternative arguments it made below to the district court as a basis for summary judgment on those claims, should it choose to do so. We affirm the district court's grant of summary judgment as to Count 1 and affirm as to all other issues.

**AFFIRMED IN PART, REVERSED IN PART.**